## DECEMBER TERM, 1843.

### JOHN B. STEGER, ADMINISTRATOR, &c. OF HARRY LONG *v.* JAMES BUSH, *et al.*

An administrator, in selling the property of his intestate, must follow strictly the mode pointed out by the statutes on that subject.

Where the statute regulating sales of estates of deceased persons, requires the administrator to take of the purchaser, "*bond with approved security*"; *held,* that the *bond of the purchaser,* and not the transfer of the note of any third person, was contemplated by the law.

An administrator sold property of his intestate, and took of the purchaser his bond for the payment, and also the note of a third person, and agreed to collect the proceeds of that note, and apply them to the payment of the purchaser's bond; *held,* that no neglect on the part of the administrator, to collect the note, and the consequent loss thereby, could have the effect of relieving the purchaser from the payment of his bond, or of discharging the statutory mortgage thereon.

In such case, the administrator would be regarded as the agent of the purchaser *quoad hoc,* the collecting the note, and not of the estate.

A party who receives from his debtor the note of a third person, as collateral security for his own debt, is bound to use due diligence in collecting it; and if it is lost, by any delay of his, he becomes responsible for the amount.

A mere delay to prosecute the collection, unaccompanied by consequent loss, will not render the creditor responsible.

Where a creditor, having sued upon collateral paper, granted a stay of execution for six months, upon the judgment; *held,* that the stay is not such delay, unless it is the occasion of the loss of the debt, as will render the creditor responsible for the amount of the collateral paper.

THE complainant, administrator *de bonis non* of Harry Long, deceased, by his bill alleges, that in November, 1837, Howell Hobbs, who was the then administrator of his intestate, having obtained an order from the Probate Court, sold the negroes belonging to the estate, and Joseph Gold became the purchaser of Ben, Jim, and boy, and gave his note for the purchase-money, three hundred dollars of which only had been paid; that said negroes were in the possession of the defendant Perry or Strother, and prays that the negroes be subjected, under the statutory mortgage, to the payment of the sum yet due for said negroes, and for general relief.

The defendant James Bush, who is the administrator of Gold, files his answer, in which he denies that Gold became the purchaser of the negroes, but the name of Gold was used to bid them

off, together with another negro since dead, for the benefit of Andrew T. Perry, now deceased. After the negroes were bid off, in order to carry out an agreement between said Perry and the administrator Hobbs, Perry assigned to Hobbs two notes, as follows, to wit : one for two thousand dollars, made by Jesse Andrews, and indorsed by N. W. Hatch and John A. Cotton, dated 12th October, 1836, and due 1st January, 1838, payable at the Commercial and Railroad Bank, at Vicksburg ; and the other made by Samuel G. Taylor, payable to Jesse Andrews, and by him indorsed, for $2530·80 (credited by $30, 12th October, 1836), due 1st day of January, 1838, payable at the Commercial and Railroad Bank of Vicksburg ; and the said Gold gave his note, with said James Bush his security, for the sum of $1403·20, which three notes, amounting together to the sum of $4904, was the full amount bid for, and the price, of said negroes ; and it was agreed, when said notes were paid, that the same was in full for said negroes, which appeared from the agreement filed as an exhibit with the answer ; by a memorandum, at the foot of which, it was agreed, that there was four months' interest on the two first notes, which, when collected, was to be credited on the last note. When this last note was executed, Bush, as the friend of said Perry, agreed to pay the same at maturity, and he accordingly paid $300, leaving the balance, of $103·20, to be paid by the interest due, when collected, on the other notes. One of the first two notes has been collected, but the other not, although judgment had been rendered upon it. Whether diligence had been used, he did not know. He believed the parties were solvent when the note was transferred to Hobbs.

Matilda Perry and Benjamin Strother, by their answer, adopt as their own the answer of their co-defendant Bush, as far as it goes. They insist that the statutory mortgage, or lien, is no longer subsisting, but has been discharged or raised. Because the first of the two notes, indorsed for two thousand dollars, had been paid ; and as to the other, in April, 1838, an action was commenced in the circuit court for Hinds county, against Taylor and Andrews, and on the 26th June, 1838, a judgment rendered for the amount, with principal and interest, of the note ; that after judgment was ren-

dered, a stay of execution was given on the record of the judgment, by agreement between Hobbs, who was the plaintiff, and the defendant, for six months, without the consent of Bush or Gold, or the respondents ; that, at the time of the rendition of the judgment, and afterwards, the defendant Andrews had sufficient property, subject to execution, out of which the amount of the judgment could have been made. And the respondents aver, that the failure to make the money was produced by the stay of execution, and by the negligence of Hobbs ; and they are advised he is responsible for such failure, and thereby the lien, or mortgage, is raised or discharged ; that the respondent, Matilda Perry, is the widow and relict of said A. T. Perry, for whom the negroes were purchased, and has possession of them, except Caroline, who had departed this life.

The judgment, with the stay of execution on the second note, was obtained June 26th, 1839, and is in these words : " This day came a jury, &c., who, upon their oath, say, we the jury find for the plaintiff, and assess his damages at two thousand eight hundred and thirty dollars and sixteen cents, *with a stay of six months.* Therefore it is considered by the court that he tplaintiff recover of the defendants, &c., *with a stay of execution six months,* and costs of suit, &c." On the 27th day of December, 1839, one day after the stay expired, execution issued ; and upon this, and other executions which issued from time to time, no money was made, because older executions took all the money produced by the levies and sales. The older executions and judgments amounted to about $7000.

William J. Denson, a witness in behalf of the defendants, testified that Jesse Andrews, at the time of the rendition of the judgment against him in favor of Hobbs, had in his possession some thirty or forty negroes. Whether they were really his he does not know, he however believes they belonged to him ; on fourteen of which he obtained, in June, 1839, a deed of trust, and in February, 1840, another deed of trust on seven of the same negroes, and upon a tract of land in Scott county.

He believes that Hobbs's judgment was older than his deed of trust, because Andrews informed him that that was the reason that

he run off his negroes, the judgment being for a security debt, and he being anxious to pay his own debts first. In an additional statement, the witness says, some time in August, 1840, he had occasion to examine into the indebtedness of Jesse Andrews, and found his liabilities to exceed $40,000 ; some ten or twelve thousand dollars in judgments. In the spring of 1840, he obtained a deed of trust on the seven negroes, and the land in Scott ; and the fourteen, stated in his former deposition to have been conveyed, embraced those conveyed by the deed of trust. He never had any lien on any other than the fourteen negroes : at the same time with the above transactions, he obtained of Andrews, effects to the value of $7000.

Howell Hobbs, the former administrator, testifies to the sale and purchase of the negroes, as set out in the answers, except that he understood that the sale was for the benefit of Gold himself : he proves the agreement filed with the answer of Gold, and that the first note has been paid ; but the other has not been paid, although he insists that he used due diligence, and that the bill of sale he gave was only to be positive when the two notes were fully paid : the title to be complete when the notes were paid.

Drury J. Brown testifies that he was present in court on the 26th June, 1839, being subpœned as a witness for plaintiff, and heard a conversation between Maj. Work, counsel for plaintiff, and Judge Mitchell, counsel for the defendants, in the case of *Hobbs* v. *Taylor & Andrews*, in which Mitchell proposed that he might take a judgment, provided he would give a stay of six months ; to which Work agreed, on the condition that the case be submitted to the jury, and let them give a verdict. Some four or five months after the rendition of the judgment, the witness was at the house of Andrews ; he then had some twenty-five negroes : some time after, he was again at his house, and found no negroes : he understood they had been run off. He believes that between the 26th June, 1839, and six months thereafter, the amount, and three times the amount, of the judgment of Hobbs, could have been made from the property of said Andrews.

O. D. Battle, witness for complainant, testifies that he believes,

at the time of the rendition of the judgment of Hobbs, in June, 1839, against Taylor & Andrews, that Andrews was hopelessly insolvent ; not even able to pay his own debts, much less those on which he was security or indorser. Witness had to pay $2000 or $3000 for him, on execution, and is responsible for him, and on which he has been sued, for about $17,000; and has used every means in his power to save himself, but without effect : believes that Andrews, when he run off his property, had liens and judgments on it, to an amount exceeding its value : has heard that Andrews run off some ten or fifteen negroes.

The following is the copy of the bill of sale, exhibited with the answer of the defendant, Bush :

" Received of Joseph Gold, one note for two thousand dollars, made by Jesse Andrews, and indorsed by N. W. Hatch, and John A. Cotton, dated 12th October, 1836, and due 1st January, 1838, and payable in the Commercial and Railroad Bank, at Vicksburg; also one note made by Samuel G. Taylor, payable to Jesse Andrews, and by him indorsed, for twenty-five hundred and twenty $\frac{80}{100}$ dollars, and credited by thirty dollars, dated 12th day of October, 1836, and due 1st day of January, 1838, payable in the Commercial and Railroad Bank, at Vicksburg ; also his note, with security, for four hundred and three and $\frac{20}{100}$ dollars, it being the amount of the purchase-money for the following negroes : Ben, Jim, boy, and Caroline ; the above-described notes, when paid, will be in full for the above-named negroes. Given under my hand and seal, this 2d day of November, 1837. H. Hobbs, Administrator of H. Long, deceased."

" Four months' interest on the two first-named notes, amounting to four thousand five hundred dollars, to be credited on Joseph Gold's note, when they shall be collected. H. Hobbs."

*Work*, for complainant.

The sale of the negroes took place about 2d November, 1837, and from that time the administrator had the statutory mortgage. See H. & H. 417, sec. 110.

The note on Taylor, indorsed by Andrews, fell due 1st January,

1838, and suit was instituted thereon in the Hinds Court, 14th April, 1838, the first court after the note fell due.

There is no proof that the plaintiff, or his attorney, gave any indulgence. The jury, *in their verdict*, as the record filed by defendants will show, found for the plaintiff, with a stay of six months, and the judgment of the court was for the amount found, and the stay of six months. The stay, as appears, was the act of the jury, and the court. Judgment in favor of Hobbs was given 29th June, 1839, and the defendants file, in this case, an exhibit, showing that there were against Andrews five older judgments than that of Hobbs's, two of which amounted to $4867·34, and there are also three other judgments against Andrews, and some of which, by the judgment of the Court, took the money in preference to Hobbs's, which raises the presumption, that the last three were older than that of Hobbs's.

The executions (two of them) were in the hands of the sheriff of Warren and Hinds, under which they sold nine negroes, cattle, &c., the property of Andrews, for $4224·50, $642·84 less than the amount of the aforesaid oldest judgment ; and the sheriff returned that Andrews had no other property.

From this state of facts, which it is believed will be fully sustained by the papers before the Court, it is apparent that judgments given against Andrews, in 1838, long before the judgment of Hobbs could be, or was rendered, could not be satisfied, and that the judgment of Hobbs could not have been made *with* or *without* the stay of six months, and that said stay of execution (admitting it to be a stay) operated no injury to the defendants, and that, therefore, they cannot protect themselves by it. If this could be assimilated to a case of indulgence given to a principal by the creditor, by which a surety claimed to be released (which it cannot be ; 3 Powell, 944 ; 2 Stark, 178, *Bedford* v. *Deakin*), it would not release the surety, for the indulgence does not appear to be *founded on any consideration*. 4 Howard, 684, *Newell and Pierce* v. *Hamer,* &c.; 6 Cond. Rep. 636, *M'Lemore* v. *Powell.*

The prior lien of the mortgage made on the sale, 1st November, 1837, gave a right to a prior satisfaction, and the mere fact

of not proceeding till a *subsequent lien* had attached, would not defeat that lien ; but here it does not appear that any subsequent lien did attach. *Rankin, &c.* v. *Scott,* 12 Wheaton, 177 ; 6 Cond. R. 506 ; *Andrews* v. *Wilkes,* 148, late manuscript opinion of High Court, January term, 1842 ; 1 Peters, 443 ; Baldwin 246.

The stay, if it can be called a stay, was the finding of the jury, and judgment of the Court ; and if it is irregular, it is binding on all until reversed.    1 Bibb. 346, *Reed* v. *Hatcher.*   Verbal testimony cannot contradict the record ; Hardin, 407 ; see H. & H. 620, making judgments a lien, not as strong as the mortgage lien. See Lit. Sel. Cases, *Hynes* v. *Rogers,* 229 ; 3 Powell on Mort. ed. 1828, side page, 949 (note E. 2).

The deposition of Drury Brown is loose and vague, and taken without cross-examination, and wholly unsatisfactory ; and, further, is incompetent to contradict the record, which shows the stay to be the act of the Court, and not of the administrator or attorney.

The bill of sale filed by the defendants given by Hobbs, the first administrator, expressly provided that the defendants were not to have a title to the negroes, till the notes *were paid,* and is precisely such a case as in Littell's Selected Cases, 229, aforesaid.    The counsel of complainant strongly relies on the opinion of Marshall, in the case of *Rankin, &c.* v. *Scott,* before referred to.  The particular attention of the Court is requested to the deposition of Owen D. Battle in this case, which shows that Andrews was insolvent from 1838, long before Hobbs's judgment (26 June 1839), till he went to Texas, in 1840.

*Robert Hughes,* for defendants.

We will urge several considerations upon the Court, why there should not be a decree for the complainant.

1. We insist that the facts and circumstances stated in the answer of Perry and Strother, and proven by the witnesses and the exhibits, show that Hobbs took the two notes referred to, engaged to collect them, and, when collected, the amount received should be in full of the price of the negroes ; and that one of said notes has been paid, and the other not paid or collected, by the laches of

Hobbs or his counsel ; and, consequently, that it is the same thing as if it was paid.   He is chargeable with it, and to that extent the statutory lien or mortgage is discharged.

. Let us first apply the facts.   The record, Exhibit No. 2., to the answer of Perry and Strother, shows that a stay was entered on the record by the Court, upon the rendition of a verdict, and after judgment.   The entry of the stay, and the manner of it, is a curious legal proceeding, but for the testimony by which it is explained. The witness, Brown, was present, and heard a conversation between counsel, in which it was agreed that a judgment be rendered, provided a stay of six months was given ; and the case was submitted, on these terms, to the jury, and they rendered a verdict to that effect ; and the Court carry out the agreement, by entering a stay of execution accordingly.   The same witness, Brown, and also W. J. Denson, show that, but for this stay, the money, by the use of due diligence, could have been made.   Brown swears, that during the stay, he saw about twenty-five negroes in the possession of Andrews ; and he has no doubt that three times the amount of the judgment could have been made : and Denson shows that Andrews had some forty negroes ; and he, by the use of proper diligence, so late as the winter and spring of 1840, secured fourteen negroes, and other effects, to the amount of $7000 ; true, he speaks of a lien which he had, but at the same time shows, most conclusively, that this lien, whatever it was, was younger in time than that of the Hobbs judgment ; yet Hobbs says he could not make the money by due and proper diligence.   True, Mr. Hobbs, but if you had not given the stay, and thereby tied up your hands from proceeding until after Andrews run off his property, by the use of proper diligence you might have made the money, in full of the judgment : but in consequence of the stay of execution, all that could be run off, was so run off ; and then, when the execution issued, the older executions, to the amount of about $7000 (and this is the full amount of all prior liens proven), took the whole of the property remaining ; and the younger judgment was left entirely unpaid. Now, whose act was this, and who is to suffer by it ?   It was, most clearly, the act of Hobbs, the administrator, without the knowledge or consent of those now attempted to be affected by it; and the loss

should fall on Hobbs, or the estate for which he was acting, and not on Gold, or his estate, or upon Perry, or those claiming under him.

Place the case on the strongest ground on which it can be placed for the estate of Long, that Hobbs, acting in the character of administrator, in order to the collection of a debt for the estate, undertook to collect this debt; even then, the estate would be chargeable; because he would be acting as agent for the estate, and for the other party. In this character, he should have prosecuted the action against Taylor and Andrews, to final judgment; and, without stay, enforced execution. The principles which should have governed him, in this view of the case, are well laid down by the High Court of Errors and Appeals, in the case of *Fitch* v. *Scott*, 3 How. 314. That was a case against an attorney for negligence, in which, after the commencement of an action on a claim taken for collection, the attorney took from the defendant the assignment of a judgment, and dismissed the suit against him; and the Court say: " The suit should have been prosecuted to final judgment, and then the process of obtaining satisfaction of it strictly followed up. By doing so, the ability of the debtors to pay the claim could have been tested by a legal and certain criterion." But this was not done; and, for the reason set out in the opinion, the attorney was held liable, to the amount of the claim. And so in this case, Mr. Hobbs, acting for the estate of Long, and upon his engagement with Gold, should have made no compromise with Andrews, but should have pressed the claim to judgment; and then, if, upon execution pressed in proper time, the money could not be made, Gold, or those claiming under him, would have been responsible. But, having taken upon himself to act otherwise, he must take the consequences; which must be a loss to the estate of Long, and not to the other parties.

The right view, however, as counsel for the defendants believe, to take of this case, is, to place the engagement and liability of Gold and those claiming under him, and that of Hobbs, on the footing of creditor and debtor, and security.

The Exhibit No. 1, filed with the answer of Bush, shows that the notes were delivered to Hobbs, and, when collected by him, were to be in full payment for the negroes sold. This in itself, embraces an engagement, that Hobbs would use due and proper dili-

gence to collect, and not to look to the purchaser of the negroes, until a proper effort to collect those notes was made ; and an engagement on the part of Gold, or those under him, that after due diligence, and a failure to collect, they would pay. This, in all its features, is like the engagement of a security, or indorser, only to be enforced against the security, or indorser, in the event of nonpayment by the principal, after the use of proper means of enforcement on the part of the creditor. The engagement is conditional : I will pay, if another does not. The proper means, therefore, must be used, to make that other pay, or the conditional promise does not become absolute.

In reference to such engagements or promises, it has been repeatedly decided by the courts, that any *binding* agreement, by which the terms of the agreement are charged, such as giving time, and the like, is a release of the surety or indorser. See *Newell* and *Pearce* v. *Hamer, et al.*, 4 How. 684.

The agreement by which the terms of the agreement are charged, must be a binding one ; because, if otherwise, no injury would be supposed to be done. To illustrate ; where judgment is rendered against principal and surety, and after judgment, the creditor or plaintiff, on application of the principal debtor, gives time on the execution, by directing the execution not to issue, or when execution has issued, directing it to be returned without making the money, or agrees for a specified time not to make the money ; but this is not founded upon any consideration, but is merely voluntary ; it is not binding, and the plaintiff is not bound to stand to it, but, notwithstanding his agreement or direction, may order an execution out, or have the money made. But where there is something given, some consideration deemed good in law passes, then the agreement is binding, and if violated can be enforced. In such a case the surety is discharged, because the law says he may pay the debt ; and, on payment, is entitled to be substituted to the rights of the creditor or plaintiff in the execution, and to make the money immediately on the execution for his own benefit. But where there is a subsisting agreement, which can be enforced, for a stay of execution, his situation is materially changed by the creditor. He

cannot, by payment, be placed in a situation by which he can be re-imbursed ; and the law, therefore, says he is discharged.

In these cases no inquiry is made, as to whether the money could or could not be made, but for the stay, or whether after stay it can be made. But upon the fact being ascertained, that the situation in which the surety has a right to be, has in fact been altered without his consent, he is discharged, and the creditor is left to resort to the principal, for the recovery of his debt.

Do not these principles apply to the case under consideration ? We think they do, most forcibly. A judgment was about being rendered, upon which, in the event of its payment, the title to certain negroes would vest and be absolute in the defendants. But in the event that the money on it could not be made, and the proper steps had been taken to enforce payment without effect, then the party claiming the negroes would not have them without paying the amount of the judgment. The money was not collected on the judgment, and that which the law required to enforce it was not done, but time given instead of an enforcement of the execution. Gold, or those claiming under him, had a right to pay the money to Hobbs, and take the judgment, and make the money upon it for their security at the time of its rendition ; but, instead of giving them an opportunity of doing so, an agreement binding upon Hobbs is made, for it was a part of the judgment of the Court, and founded upon what the party took as a good consideration, the permitting the judgment to go without contest, by which stay of execution is had for six months, and thereby the situation of the parties is changed, and the defendants are discharged.

But suppose we are wrong in the application of these principles to the case. Then we insist that there are other principles by which this case is to be governed, and which will settle the question. It is evident that the defendant, or the purchaser of the negroes in contest, could not be made chargeable in any manner, for the amount of the two notes delivered to and receipted for by Hobbs, but upon the statutory mortgage. There certainly was no liability on the paper delivered, because the name or names of none of the parties are upon it ; and in order to charge the property sold, and which is now in contest, he, the administrator, would have to come

Steger *v.* Bush, et al.

into this Court, upon the footing of the agreement which was made ; and that is what he, or his successor, has done, or rather attempted to do. How, then, does it stand ? He has or should have alleged that, as administrator of Harry Long, deceased, by order of the Probate Court, he sold the personal estate of said Long, and Joseph Gold became the purchaser of four of the negroes ; for which, however, he gave no note, but by an arrangement with (which was satisfactory to) the administrator, he transferred two notes, without indorsement, which he, the administrator, undertook to collect, and when collected, the same should be in full ; that he had collected one of the notes, but, after judgment and execution, he could not collect the other ; and, therefore, asks for an account, and that the property sold be subjected to the payment of the amount. If these facts, as stated, were admitted to be true, the Court would give the relief asked. But suppose, as is the fact, that the defendant says, true, the administrator has not got the money, but it is because he has not used the diligence required by law, but permitted six months after judgment to elapse without execution. What, then, would the Court say ? It is believed, that the reply of the Court would be, that an essential part of the title, to recover the money, or charge the property, *is* a statement of the reasons, or accounting for the fact, that the money was not made out of the note assigned ; and if, upon his own showing, or upon evidence, it becomes manifest, that the fact is to be accounted for by the negligence or failure to prosecute the claim in due time, then a title to recover is not made out. The principles which govern courts in other States, upon like cases, may, perhaps, afford us aid in our inquiry.

In Kentucky, choses in action are assignable, but not negotiable. There, an assignor of an assignable instrument is responsible on his indorsement, and will be chargeable to the amount of what he has received for the assignment, with interest, but only in the event that diligence is used to collect the amount of the note assigned, from the obligor or maker, and for the reason that the parties, by their agreement, look to payment from the instrument assigned, and one is intrusted by the other with the collection ; and before any other mode of payment can be insisted upon, than from the paper assigned, he who is the assignee, and who has been intrusted, must show that the

trust has been performed, and that with all diligence ; and in Kentucky, upon this question, these adjudications have been made. Assignee must use due diligence to recover the money of the obligor. An execution sent to a county where the obligor does not reside is not due diligence. *Hogan* v. *Vance,* 2 Bibb, 35.

The assignor is responsible, to refund the consideration received, if satisfaction cannot be obtained after due diligence by suit. 2 Bibb, 424 ; 3 J. J. Marsh. 268.

To omit to demand bail, when bail was demandable, in case the *ca. sa.* is returned *non est inventus,* is negligence. *Spratt* v. *McKinney,* 1 Monroe, 103, 104.

A contract is implied to refund' the consideration received for the assignment, upon failure to collect from obligor, upon due diligence. *Thompson* v. *Caldwell,* 2 Bibb, 291.

The nature and extent of the engagement is not changed, by an agreement under seal, in the assignment, to pay in the event that the money is not made out of the obligor. By such agreement the action to be brought is only · changed, and diligence, as in other cases, is to be shown. *Crann* v. *Hopson,* 4 Bibb, 286 ; S. C., 1 Marsh. 228.

Staying an execution, after property seized, is a discharge of assignor. *McGinnis* v. *Barton,* 3 Bibb, 6.

The assignee bound to sue at the first term. 2 J. J. Marsh. 218.

Suit must not only be commenced in time, but execution must also issue in due time ; and for neglect, in either, the remedy against the assignor is gone. *Smith* v. *Blount,* 2 Marsh. 522.

If the principles of these cases are applicable to the case under consideration, and that they are we cannot doubt, then the facts in the case show the complainants not entitled to the relief asked. For the remedy on the note in question has not been pursued with the diligence required by law, but the reverse is shown, and by it, as shown by the testimony in the cause, the debt has been lost, when, if a proper degree of diligence had been used, it would have been made.

*Calhoun,* for complainants, in reply.

It is contended by the defendant in this case, that the statutory

lien upon the negroes, sold by the administrator to Gold, has been waived and forfeited by complainant, by the supposed stay, given on the judgment against Taylor and Andrews. It is believed this defence cannot avail them. It will appear by the record, that the stay of execution was given in the verdict and judgment ; and the record nowhere shows that this was by the consent of the counsel of Long's administrators. See the last page of the record. The record cannot be explained, contradicted, or enlarged by parol testimony, as has been attempted by the deposition of Brown. If the judgment is irregular, that irregularity cannot operate a forfeiture of the plaintiff's lien on the slaves, for the purchase-money. It is competent for the debtor to contract with the creditor for time, and if the debt is due on simple contract, the defendant can plead a contract upon *valuable consideration* for delay ; and for anything that appears to the Court, Taylor and Andrews may have had a right to this indulgence, by contract with the payees before assignment. Neither the attorney nor administrator could release the lien, by any collateral or direct act, except on payment of the money.

But the principles of law which govern this case, will be best seen by turning our attention to the contract between Hobbs, the administrator, and Gold, the purchaser of the negroes. It is the duty of administrators to sell the property of the intestate, upon a credit of six months, taking bond and security from the purchaser. See How. & Hutch. 411. The negroes, we must presume, were offered for sale on these terms, by Hobbs. Gold bid them off, and became thereby liable to the administrator for the amount in cash, and, on failure to comply with the terms of the sale, by giving bond and security, could have been at once sued for it. The administrator had no power, as such, to commute the security, which the law required by taking notes on other persons. The administrator, in taking the notes in this case, became trustee, in his individual capacity, of Gold, and, as such, is liable for negligence, if any has been committed, which is denied. An administrator has particular delegated powers, specially given by law, and when he acts beyond those powers, it is plain that such acts cannot be his acts as administrator. Thus, if he assigns a note given

VOL. I.  22

to his intestate, in payment of his own debt, the assignment is void. 4 Howard, 237.   By the very terms of the receipt of the administrator and informal bill of sale, it appears *that the title should not vest in Gold, until the money was paid.*   See bill of sale filed by defendants.   The lien which the statute gives on slaves for the purchase-money  cannot be divested, except upon due course of administration.   He cannot sell or dispose of it for property or notes, but it can only be  discharged  by payment, for the benefit of the creditors and distributees.   Gold is presumed to know that the administrator had  no  power,  as  such,  to receive the notes in discharge of the bid, and he must abide the consequences of this irregularity.

But again ;  Gold was liable on his bid for the money, and it lies not with him, or the other defendants, to complain that due diligence was  not used to  collect  the notes, for he could, at any time, have paid the amount of the bid, and taken the control of them.   An indorser is not released on  refusal of the holder to sue on the bill, although he has notice to  do  so, and although the principal becomes insolvent.  5 Howard, 689.  Nor is he discharged, if the execution against the principal is recalled, *contrary to the request* of the indorser, to have it levied.   *Lenox v. Prout,* 4 Con. Rep. U. S. 311.

But if these views should not be correct, still, before the defendants can avail themselves of this defence, it must appear from the evidence, that the money could have  been made on the judgment against Taylor and Andrews, if the stay had not been given.   The proof does not show this.   It appears from the evidence, that judgments against Andrews to a large amount, of prior date to this, yet remain unsatisfied, and that Taylor was insolvent.   It is true, one of the witnesses says he saw some twenty-four negroes at the house of defendant Andrews, after the rendition of judgment, which he supposed were his ; but this is too vague.   The witness Battle, states, that all his property, at the date of the judgment, was incumbered with liens, and that he was insolvent ; and Denson states, that his property was scattered, and hard to find, and that he was on the search.   The record shows older judgments against him, to the amount of $7416, with interest thereon, for a consid-

erable time before the rendition of the judgment of Hobbs against him, and the witness Battle speaks of others. Most of this amount remains yet unpaid, although due diligence, we must presume, was made to collect it. Besides, all the property which he had in his possession at the date of the judgment remained in his possession till after the six months' stay expired, and the execution had issued on the judgment of Hobbs ; and if he did not become insolvent pending the stay, but the debt was lost by his absconding with his property afterwards, certainly the complainants ought not to bear the loss occasioned by that act. So, upon every view of the subject, it is believed the complainants are entitled to relief.

The decisions in Kentucky, the Court is well aware, arise out of their peculiar statute of assignments ; the statute, or the decisions under it, have no analogy to mortgages, and it is believed those decisions can have no application to this case. It is believed the defendants' counsel has taken an erroneous view of some of the *facts* of the case, and has made improper inferences from the supposed facts ; if the execution had issued the day the judgment was given, it is manifest it could not have been made, because of numerous older judgments, which *did* take the money from Hobbs's judgment.

CHANCELLOR. The complainant, as the administrator *de bonis non*, upon the estate of Harry Long, deceased, seeks to foreclose the statutory mortgage, given in the case of administrator's sales, for a balance of the purchase-money, due for some negro slaves, belonging to his intestate, which were sold by the original administrator, and which are now in the hands of the defendant, Matilda Perry, whose husband seems to have been the real, although not the nominal, purchaser thereof. The case is defended on the ground, that, as to the unpaid portion of the purchase-money, the original administrator received the note of a third person, with indorsers, the proceeds of which were to have been applied in payment of this debt ; and that the administrator delayed the prosecution of that claim, until the parties thereto became insolvent. It is hence insisted, that the administrator became liable for the amount of the note so received ; and that, as a consequence there-

of, the lien or statutory mortgage on the slaves is released and discharged.

Assuming for the present, that the facts, as thus stated, are true, it may be doubted, whether the legal consequences, which are supposed to follow them, are correctly laid down. By the statutes of this State, the power of an administrator, in selling the property of his intestate, is restricted to the mode there pointed out. It is declared, that he shall make such sales upon a credit of at least six months, taking from the purchaser " *bond, with approved security.*" How. & Hutch. 411, sec. 86. It is evident, that the bond of the purchaser himself, and not the transfer of the note of any third person, is what is contemplated by the laws. I think that there are the most solid reasons for questioning the power of an administrator, in such case, to substitute any other form of contract, or any other kind of security, than those prescribed by the law. The law contemplates an original and absolute liability on the part of the purchaser ; and I incline to think that the administrator has no discretion to change its character into a mere secondary and contingent liability, by taking his indorsement of the note of a third person.

Such discretion would prove extremely hazardous to the safety of the estates of deceased persons. The stable security, which the law has wisely provided in such cases, would be often defeated by the accidents attendant upon the steps, necessary to fix the collateral liability of the purchaser, growing out of his indorsement. It would seem, upon principle, that where the law has prescribed one mode of doing a thing, it must be regarded as a limitation of power, and as an implied exclusion of every other mode of doing the same thing. An administrator is, in one sense, the agent of the law, which prescribes his duty and limits, and defines his power. His powers, in general, are no way analogous to those of an executor, who is the representative of his testator, and may do any act which the testator might have done, connected with the estate, unless inhibited by the will, or restricted by rules of law. If then it be true, that the original administrator, in this case, had no authority in law for receiving the note of a third person, in lieu of the direct liabilities of the purchaser at the sale, it is quite clear

Steger *v.* Bush, et al.

that no future neglect of his to enforce the collection of that note, could have the effect of discharging the mortgage which the law gives upon the property sold. I think that the administrator, in receiving the note, and undertaking its collection, must be regarded *quoad hoc*, as the mere agent of the purchaser, acting for his accommodation, and not as the representative of the estate. This, indeed, would seem to have been the true character of the understanding between the parties, as evidenced by the receipt taken on the occasion, which shows nothing more than a mere promise to apply the proceeds of the transferred note, when collected, in discharge of the money due for the purchase of the negroes. But, supposing the administrator to have been in the due exercise of his fiduciary duty and authority in taking the note, I am not prepared to admit, from the facts of the case, that such consequences follow the alleged delay, as those insisted on for the defendants. It appears, that the note was duly put in suit and prosecuted to a judgment against the maker and original indorser; but in taking that judgment, the administrator appears to have consented that it should be rendered with a stay of execution for six months; and this is the delay of which the defendants complain. Now I admit that a party, who receives from his debtor the paper of a third person, as collateral security for his own debt, is bound to use due diligence in collecting it, and that if it is lost by any delay of his, he becomes responsible for the amount, and will be considered as having made the debt his own.

But something more than mere delay is necessary in such cases; because mere delay, if no loss followed as a consequence thereof, could not be made the foundation of any complaint on the one hand, or of responsibility on the other. The counsel for the defendants seem to have been fully aware of the correctness of this position, and have introduced some verbal testimony, to show that the judgment might have been made available, but for the stay of execution which was given: this testimony goes no farther than to show that after the rendition of the judgment, one of the defendants thereto was in possession of a considerable amount of property. But the witness seems to have known nothing of its condition, whether it was or was not covered by numerous older liens and in-

Steger *v*. Bush, et al.

cumbrances.    I am fully satisfied, from the whole proof in the case, that no amount of vigilance, in the prosecution of the judgment, could have made it available ; and that the failure to realize the amount thereof, must be ascribed to the existence of prior liens and incumbrances, which absorbed the whole property of the defendant in the judgment, and not to the delay which was given by the stay of execution.    I arrive at this conclusion, as well from the testimony of Battle, who seems to have been familiar with the condition of Andrews, and who swears that he was totally insolvent in 1838, one year before the judgment was rendered, as from the record-evidence in the case, showing that there were numerous judgments for large amounts in the same court against him, of older date than the one on the note referred to, and which are still unsatisfied, after having been rigorously prosecuted.

Upon the whole, I shall direct a reference, to ascertain the amount due the estate of Long, and upon the coming in of the report, a decree may be had, enforcing the statutory lien upon the slaves mentioned in the bill ; costs to be paid from the proceeds thereof.